THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. __: ___-CV-___-___

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| HARBOR LIGHT ASSET MANAGEMENT, LLC AND MICHAEL ANTHONY JENKINS, | ) ) ) ) |
| Defendants. | ) ) ) ) ) ) ) |

COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES PURSUANT TO THE COMMODITY EXCHANGE ACT

**JURY TRIAL DEMANDED**

Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by its attorneys, alleges as follows:

**I.**

**SUMMARY OF DEFENDANTS' VIOLATIONS OF THE COMMODITY EXCHANGE ACT**

1. From at least January 2011 through January 2012 (the "Relevant Period"), Defendants Harbor Light Asset Management, LLC ("HLAM") and Michael Anthony Jenkins ("Jenkins") (together "Defendants") operated a Ponzi scheme by which they fraudulently solicited and obtained at least $1.79 million from approximately 377 members of the general public, primarily located in Raleigh, North Carolina ("HLAM Investors"), for the purpose of trading E-mini S&P 500 futures contracts ("E-mini Futures") on or subject to the rules of the

Chicago Mercantile Exchange, Inc., a designated contract market, in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (2006) (the "CEA" or the "Act").

2. In executing and furthering this Ponzi scheme, Defendants made misrepresentations and omitted material facts in statements made to at least some of the HLAM Investors including: (a) misrepresenting that all HLAM Investor funds would be invested and traded; (b) failing to disclose that Defendants were misappropriating HLAM Investors funds; and (c) misrepresenting and giving false reports to HLAM Investors that trades executed with HLAM Investors' funds were profitable and that the HLAM Investors were being, and would be, paid profits from the trading of their funds.

3. As discussed in detail below, Defendants' fraudulent conduct resulted in a loss of approximately $1.3 million in HLAM Investor Funds, consisting of $1.16 million in misappropriated, embezzled, stolen, purloined and converted funds and $140,000 in trading losses.

4. By virtue of this conduct, Defendants have engaged, are engaging and/or are about to engage in acts and practices in violation of Sections 4b(a)(1)(A)-(C), 4d(a)(1), and 9(a)(1) of the Act, as amended, 7 U.S.C. §§6b(a)(1)(A)-(C), 6d(a)(1), and 13(a)(1).

5. Jenkins committed the acts described herein within the scope of his employment or office while acting as an organizing member, managing member, owner and President of HLAM. Therefore, HLAM is liable for violating Sections 4b(a)(1)(A)-(C), 4d(a)(1) and 9(a)(1) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2.

6. Jenkins is also liable under Section 13(b) of the Act, as amended, to be codified at 7 U.S.C. § 13c(b), as a controlling person of HLAM, for HLAM's violations of the Act and

Regulations, because he controlled HLAM and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting HLAM's violations.

7. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin such acts and practices and compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and other equitable and remedial ancillary relief including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest and such other relief as the Court deems necessary or appropriate under the circumstances.

8. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in this Complaint, as more fully described below.

## II.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Section 6c (a) of the Act, 7 U.S.C. § 13a-1 (2011), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

10. Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e)(2006) in that Defendants are located or reside in this District, transact business in this District, and acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

# III.

# PARTIES

### A. PLAINTIFF U.S. COMMODITY FUTURES TRADING COMMISSION

11. Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act and Commission Regulations.

### B. DEFENDANT HARBOR LIGHT ASSET MANAGEMENT, LLC

12. Defendant Harbor Light Asset Management, LLC is a limited liability company organized in North Carolina with a registered office in Raleigh, North Carolina.

13. Throughout the Relevant Period, HLAM was not registered with the Commission. In April 2011 Jenkins submitted HLAM's application for registration as an Introducing Broker, Retail Foreign Exchange Dealer, and Commodity Trading Advisor; the application was subsequently withdrawn without obtaining registered status.

### C. DEFENDANT MICHAEL ANTHONY JENKINS

14. Defendant Michael Anthony Jenkins is an individual residing in Raleigh, North Carolina.

15. During the Relevant Period, Jenkins was the member organizer, managing member, owner and President of HLAM and the authorized signatory for the HLAM bank account.

16. In April 2011, Jenkins applied for registration with the CFTC as an Associated Person, but the application was withdrawn without obtaining registration.

17. Jenkins had previously been registered with the Commission as an Associated Person in 1984. During that time, he was employed by a firm registered with the Commission. Jenkins' registration was withdrawn in 1986.

18. In 1989, Jenkins was barred from the securities industry for conduct that occurred during his employment at the firm registered with the Commission. On April 14, 1989, the National Securities Dealers Association ("NASD") permanently barred Jenkins from association with any of its members and fined him $5,000. The NASD found that Jenkins, without the knowledge and consent of a customer, deposited a customer's check into Jenkins' account for Jenkins own use and benefit.

IV.

**FACTS ESTABLISHING DEFENDANTS' VIOLATIONS
OF THE COMMODITY EXCHANGE ACT**

19. Jenkins, directly and on behalf of HLAM, solicited potential HLAM Investors located primarily in Raleigh, North Carolina for the purpose of investing in E-mini Futures.

20. Jenkins met with and solicited potential HLAM Investors in person, in small groups, and by phone.

21. As a result of Jenkins' solicitation efforts, at least 377 HLAM Investors signed a one page Investment Agreement (the "HLAM Investment Agreement"), and completed an HLAM Investor Fact Sheet (the "HLAM Investor Fact Sheet").

22. Most of the funds received from the HLAM Investors ("HLAM Investors' Funds") were not invested in E-mini Futures. Instead, most of the investor funds were misappropriated by the Defendants, as discussed below.

5

**Material Misrepresentations and Omissions Regarding Use of Funds**

23.     The HLAM Investment Agreement, which was signed by Jenkins in addition to the respective HLAM Investor, falsely and intentionally or recklessly, represented to HLAM Investors, *inter alia*, that:

   a. the investment was for "the sole purpose of investing in the Standard & Poor's 500 Emini Contracts;" and

   b. the HLAM Investor's funds would be immediately wired to a specific trading account ("HLAM Investors Account").

24.     Jenkins intentionally or recklessly did not disclose to HLAM Investors that HLAM did not have a trading account in its name or that the HLAM Investors Account identified in the HLAM Investment Agreement was held in Jenkins' name.

25.     Defendants executed at least 377 HLAM Investment Agreements with HLAM Investors during the Relevant Period.

26.     Jenkins intentionally or recklessly did not disclose to HLAM Investors that some of the HLAM Investor funds were transferred to a number of trading accounts held not in the name of HLAM, but in personal trading accounts held in the name of and owned or controlled by Jenkins, and used to trade gold futures, oil futures, stock index futures, in addition to E-mini Futures.

27.     Jenkins intentionally or recklessly did not disclose to HLAM Investors that some of the HLAM Investor funds were transferred to Jenkins' personal bank accounts where HLAM Investors' Funds were comingled with his personal funds and misappropriated to pay his personal expenses, and to make cash withdrawals and payments to HLAM Investors that purported to be profits.

6

28. Statements made by HLAM and Jenkins in the HLAM Investment Agreement set forth above, were material misstatements and fraudulent omissions.

**Misappropriation of the HLAM Investors' Funds**

29. Of the approximately $1.79 million invested by the HLAM Investors, only $138,825 was transferred to the HLAM Investors' Account to trade E-mini Futures.

30. The trading in the HLAM Investors' Account resulted in trading losses of $140,000, which Jenkins concealed from HLAM Investors.

31. HLAM and Jenkins used some of the HLAM Investors' funds to pay for HLAM Investors' purported withdrawals of principal or fictitious profits, the latter of which HLAM and Jenkins had falsely reported in trading spreadsheets and statements, which they emailed or caused to be emailed to HLAM Investors approximately once a month.

32. Of the amount of approximately $1.65 million that was received by Defendants from HLAM Investors but not invested at HLAM Investors' Account:

    a. Jenkins misappropriated approximately $748,827 by trading in his personal accounts to trade gold futures, oil futures, stock index futures and E-mini Futures and through cash withdrawals and payment of his personal expenses -- including payments for charges at department and discount stores, gasoline stations, cellular phone bills, and airline tickets.

    b. Defendants returned approximately $903,513 to HLAM investors. Of that amount, approximately $411,173 of HLAM Investor funds was returned to some HLAM Investors in excess of the principal they invested. The amount returned in excess of principal to some HLAM Investors consisted of funds belonging to, and was a loss to, other HLAM Investors.

7

c. In total, Defendants misappropriated $1.16 million comprised of taking $748,827 for trading in his personal accounts and through cash withdrawals and payment of Jenkins's personal expenses and paying $411,173 to certain investors in excess of their principal invested.

**False Statements Regarding Profits and Value of Investments**

33. On a nearly monthly basis throughout the Relevant Period, Jenkins sent or caused to be sent e-mails to some of the HLAM Investors attaching a "comprehensive trading spreadsheet" ("HLAM Trading Spreadsheet") that purported to reflect the deposits made, the net dollars/trade balance forward, and the total balance for the respective HLAM Investor's investment.

34. For example, an HLAM Investor invested $500 in April 2011. On December 22, 2011, Jenkins provided that HLAM Investor with a "spreadsheet update" falsely representing the total value of his investment as $18,256.27 in December 2011.

35. In many of the HLAM Trading Spreadsheets, Jenkins and HLAM falsely reported that each HLAM Investor made money every month during the Relevant Period.

36. In many of the HLAM Trading Spreadsheets Jenkins intentionally or recklessly failed to list or reflect any diminutions in value of Investors' funds during the Relevant Period for trading losses and misappropriation of HLAM Investors' funds. The balance forward and total balance amounts in Trading Spreadsheets provided to HLAM Investors by Jenkins and HLAM were fictitious.

37. On a near monthly basis, Jenkins also sent or caused to be sent an email to some of the HLAM Investors attaching a "comprehensive trading statement" ("HLAM Trading

Statement"). The HLAM Trading Statement listed the "Monthly Net Profit" of the respective HLAM Investor, among other things. Similar to the HLAM Trading Spreadsheets, the available HLAM Trading Statements falsely represented that each HLAM Investor's investment resulted in net profits each month.

38. For example, an HLAM Investor who invested a total of approximately $200,000 from February through June 2011, received an August 2011 HLAM Trading Statement falsely representing a monthly net profit of $108,021.

39. Many of the HLAM Trading Spreadsheets and HLAM Trading Statements misrepresented the value of the HLAM Investors' investments and profits generated. Defendants knew at the time these communications were made that some of the HLAM Investors funds had been lost and/or misappropriated.

40. Jenkins and HLAM used their misrepresentations in the HLAM Trading Spreadsheet and HLAM Trading Statements to solicit or obtain additional investments from existing and new HLAM Investors.

**Collapse of HLAM**

41. On December 14, 2011, at least some of the HLAM Investors received an email from HLAM stating that effective December 16, 2011, HLAM would no longer actively trade HLAM Investor accounts, and that HLAM would be "closing and cashing-out the existing accounts."

42. On December 31, 2011, at least some of the HLAM Investors received an email from HLAM further stating that despite "many clients' complaints about the slowness of the cash distribution" and "doubt[s] that the funds exist to cover all of the payouts, rest assured; these funds do exist." The email further stated that "[t]o calm fears and provide reassurances that the

9

accounts are fully funded, I am including my main bank statement (with account information redacted), to provide proof that the funds are real, and you WILL get your money."

43. The fabricated bank statement included with the December 31, 2011 memorandum listed an alleged balance of approximately $8.3 million in the HLAM business account and implied, therefore, that funds existed to cover the payouts to HLAM Investors, when in fact the HLAM business account had only $2,839.33 as of that date.

44. On January 31, 2012, Jenkins wrote to the Attorney General of the North Carolina Department of Justice and stated that he had created HLAM "to invest money for a few individuals;" that he "had no previous knowledge of running a business, much less an investment business;" that he had "done a poor job of running this entity;" and that he needed legal guidance how to solve these "issues."

45. Also, on January 31, 2012, Jenkins called the North Carolina Department of the Secretary of State and stated that he "had made his clients some money, but lately he had not;" that he knew that he "should have been registered," and that he wanted to "come clean"

46. On the afternoon of February 1, 2012, an email from HLAM was transmitted to HLAM Investors stating, *inter alia*, that "[i]t appears that Mr. Jenkins at minimum is running a fraudulent activity, that could even be a Ponzi Scheme." It further stated that, "we regret to inform you that HLAM and Mr. Jenkins has [sic] failed to show proof of funds or control of funds that would be used for disbursement to his clients. After repeated attempts to ascertain the validity of Mr. Jenkins claims of trading success we regret to inform all HLAM clients that no proof has been forthcoming that would indicate that Mr. Jenkins traded… ."

**Jenkins Failure to Register as an FCM**

47. During the Relevant Period, without registering as a futures commission merchant ("FCM"), Jenkins engaged as an FCM by accepting orders for the purchase and sale of futures and in or in connection with such acceptances of orders, accepted money, securities, or property (or extended credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that resulted therefrom.

48. As a consequence of this conduct, Jenkins was required to be registered as an FCM and his failure to do so was a violation of the Act.

**Jenkins Embezzled and Stole HLAM Investors' Funds**

49. Jenkins was required to be registered under the Act as an FCM.

50. During the course of his activities when he was required to be registered as an FCM, Jenkins embezzled, stole, purloined and converted HLAM Investors' Funds, which were received by him to trade in accordance with the HLAM Investor Agreements.

**Jenkins Controlled HLAM**

51. During the Relevant Period, Jenkins controlled HLAM.

52. The articles of incorporation of HLAM identify Jenkins as its member organizer and President.

53. During the Relevant Period, HLAM's business address and Jenkins residence in North Carolina were the same.

54. Jenkins solicited and accepted investments from HLAM Investors.

55. The HLAM Investor Agreements were executed by Jenkins on behalf of HLAM.

56. Jenkins was the only authorized signature in the HLAM business bank account.

57. Throughout the relevant period, on a nearly monthly basis, using an HLAM email account, Jenkins sent or caused to be sent HLAM Trading Spreadsheets and HLAM Trading Statements to many of the HLAM Investors.

58. HLAM Investor requests for withdrawals from HLAM were addressed to Jenkins. Jenkins made the withdrawals and paid HLAM Investors on behalf of HLAM.

## V.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

### FRAUD
### VIOLATIONS OF SECTION 4b(a)(1)(A)-(C) OF THE ACT

59. The allegations set forth in paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

60. Section 4b(a)(1)(A)-(C) of the Act as amended by the CRA, 7 U.S.C. §§ 6b(a)(1)(A)-(C), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person;– (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person.

61. By the conduct alleged herein, Defendants cheated or defrauded or attempted to cheat or defraud other persons and willfully deceived or attempted to deceive other persons in

12

connection with any order to make, or the making of, any contract of sale of any commodity for future delivery by fraudulently soliciting prospective and existing HLAM Investors and intentionally or recklessly making material misrepresentations and omissions, including but not limited to: (a) misrepresenting that all HLAM Investor funds would be invested and traded and not telling HLAM investors that their funds would be used for Defendants' personal use; (b) misappropriation of HLAM Investors funds; and (c) misrepresentations, and false reports, that trades executed in connection with funds invested by the HLAM Investors were profitable and that the HLAM Investors were being, and would be, paid profits from the trading of their funds.

62. Jenkins directly engaged in the acts and practices described above knowingly or with reckless disregard for the truth of his representations.

63. Jenkins committed the acts of misappropriation and the making of false statements or omissions described above, within the scope of this employment or office for HLAM. Therefore HLAM is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), as principal for its agent's violations of Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C).

64. Jenkins controlled HLAM directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, HLAM's acts constituting the violations alleged in this Count. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Jenkins is liable as a controlling person for HLAM's violations of Sections 4b(a)(1)(A)-(C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C).

65. Each misappropriation, issuance of a false HLAM Trading Spreadsheet, or HLAM Trading Statement, misrepresentation or omission of material fact including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation by

Jenkins and HLAM of Sections 4b(a)(1)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C).

## COUNT II

## OPERATING AS AN UNREGISTERED FUTURES COMMISSION MERCHANT IN VIOLATION OF SECTION 4d(a)(1)

66. The allegations set forth in paragraphs 1 through 58 are realleged and incorporated herein by reference.

67. Pursuant to Section 4d(a)(l) of the Act, 7 U.S.C. § 6d(a)(l), it is unlawful for any individual or corporation to engage as an FCM, unless such individual or corporation is registered with the Commission as an FCM and such registration has not expired nor been suspended nor revoked.

68. Section la(28) of the Act, 7 U.S.C. § la(28), defines an FCM as:

> an individual, association, partnership, corporation, or trust (i) that (I) is (AA) engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery; (BB) a security futures product; (CC) a swap; (DD) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i); (EE) any commodity option authorized under section 4c; or (FF) any leverage transaction authorized under section 19; or (bb) acting as a counterparty in any agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i); and (II) in on or in connection with the activities described in items (aa) or (bb) or subclause (I), accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom; or (ii) that is registered with the Commission as a futures commission merchant.

69. As set forth above, from at least January 2011 to January 2012, without registering as an FCM, Jenkins engaged as an FCM by accepting orders for the purchase and sale of futures and in or in connection with such acceptances of orders, accepted money, securities, or property (or extended credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that resulted therefrom.

14

70. This conduct violated Section 4d(a)(l) of the Act, as amended, to be codified at 7 U.S.C. § 6d(a)(l).

71. Jenkins committed the acts of failing to register as an FCM described above, within the scope of his employment or office for HLAM. Therefore HLAM is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), as principal for its agent's violations of Section4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1).

## COUNT III

## EMBEZZLEMENT, STEALING, PURLOINING AND

## CONVERTING OF HLAM INVESTORS' FUNDS INVIOLATION OF SECTION 9(a)(1) OF THE ACT

72. Paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

73. Pursuant to Section 9(a)(1) of the Act, 7 U.S.C. § 13(a)(1), it shall be a felony for:

> (1) [a]ny person registered or required to be registered under the Act, or any employee or agent thereof, to embezzle, steal, purloin, or with criminal intent convert to such person's use or the use of another, any money, securities or property having a value in excess of $100, which was received by such person or any employee or agent thereof to margin, guarantee, or secure the trades or contracts of any customer or accruing to such customer as a result of such trades or contracts or which otherwise was received from any customer, client, or pool participant in connection with the business of such person. The word "value" as used in this paragraph means face, par, or market value or cost price, either wholesale or retail, whichever is greater.

74. Through the course of conduct described above, Jenkins embezzled, stole, purloined, or with criminal intent converted to his own use, money, securities, or property having value in excess of $100 which was received by him to margin, guarantee, or secure the trades or contracts of customers, or which accrued from any customer in connection with the business of Jenkins.

75. This conduct violated Section 9(a)(1) of the Act, 7 U.S.C. § 13(a)(1).

15

76. Jenkins committed the acts of embezzling and stealing HLAM Investors' Funds described above, within the scope of this employment or office for HLAM. Therefore, HLAM is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2012), as principal for its agent's violations of Section 9(a)(1) of the Act, 7 U.S.C. § 13(a)(1).

## VI.

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its equitable powers, enter:

a) An order finding that Defendants violated Sections 4b(a)(1)(A)-(C), 4d(a)(1), and 9(a)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6d(a)(1), and 13(a)(1).

b) An order of preliminary and permanent injunction prohibiting Defendants, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with Defendants, including any successor or agent thereof, from engaging, directly or indirectly in conduct in violation of Sections 4b(a)(1)(A)-(C), 4d(a)(1), and 9(a)(1), of the Act, 7 U.S.C. §§ 6b(a)(1), 6d(a)(1)and 13(a)(1).

c) An order of preliminary and permanent injunction prohibiting Defendants, and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendants , including any successor thereof, from directly or indirectly:

(i) trading on or subject to the rules of any registered entity (as that term is defined in § 1a of the Act, as amended, 7 U.S.C. § 1a;

(ii) entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh), 17 C.F.R. §1.3(hh) (2012)) ("commodity options"), securities futures products and/or foreign currency (as described in §§

16

2(c)(2)(B) and 2(c)(2)(C)(i) of the Act as amended by the CRA, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

(iii) having any commodity futures, options on commodity futures, commodity options, securities futures products and/or forex contracts traded on their behalf;

(iv) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, securities futures products and/or forex contracts;

(v) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, securities futures products and/or forex contracts;

(vi) applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and/or

(vii) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered, exempted from registration or required to be

17

registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012);

d) An order directing Defendants, as well as any successors or agents thereof, to provide and accounting and disgorge, pursuant to such procedure as the Court may order, all ill-gotten gains or benefits received from the acts and practices which constitute violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

e) An order directing Defendants, as well as any successors or agents thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

f) An order directing Defendants, and any successors or agents thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act, as amended, as described herein;

g) An order directing that Defendants, and any successors or agents thereof, to provide the Commission immediate and continuing access to their books and records, make an accounting to the Court of all of Defendants' assets and liabilities, together with all funds they received from and paid to HLAM Investors, and other persons in connection with commodity futures transactions or purported commodity futures transactions, including the names, addresses and telephone numbers of any such persons from whom they received such funds from January

2011 to the date of such accounting, and all disbursements for any purpose whatsoever of funds received from HLAM Investors, including salaries, commissions, fees, loans and other disbursements of money and property of any kind, from January 2011 to and including the date of such accounting;

      h)      An order directing each Defendant, and any successors thereof, to pay a civil monetary penalty under the Act to be assessed by the Court, in the amount equal to the greater of $140,000 or triple the monetary gain for each violation of the Act, plus post-judgment interest;

      i)      An order requiring Defendants and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

      j)      Such other and further relief as the Court deems proper.

# VII.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: November 20, 2012

          Respectfully submitted,

          ATTORNEYS FOR PLAINTIFF U.S. COMMODITY
          FUTURES TRADING COMMISSION

          Stephen J. Obie
          Associate Director/Regional Counsel


          /s/ Xavier Romeu-Matta
          _____

          Trial Attorney
          (646) 746-9753 (direct);
          *xromeu-matta@cftc.gov*
          *Registration No.: 2416253(NY)*


          Nathan B. Ploener
          Senior Trial Attorney
          (646) 746-9740
          *nploener@cftc.gov*
          *Registration No: 4731865 (NY)*

          Manal Sultan
          Chief Trial Attorney
          (646) 746-9761 (direct);
          *msultan@cftc.gov*
          *Registration No.: 2738805(NY)*

          United States Commodity Futures Trading Commission
          Division of Enforcement
          140 Broadway, 19th floor
          New York, NY 10005
          Telephone: (646) 746-9700
          Fax: (646) 746-9940