## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:12-CV-758-F

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) **ORDER FOR ENTRY** |
| | ) **OF DEFAULT JUDGMENT,** |
| v. | ) **PERMANENT INJUNCTION, CIVIL** |
| | ) **PENALTIES, AND OTHER** |
| HARBOR LIGHT ASSET MANAGEMENT, | ) **EQUITABLE RELIEF PURSUANT** |
| LLC AND MICHAEL ANTHONY | ) **TO FEDERAL RULE OF CIVIL** |
| JENKINS, | ) **PROCEDURE 55(b)(2)** |
| | ) |
| Defendants. | ) |
| | ) |

On November 20, 2012, the U. S. Commodity Futures Trading Commission

("Commission" or "CFTC") filed a Complaint in this civil action against defendants Harbor

Light Asset Management, LLC ("HLAM") and Michael Anthony Jenkins ("Jenkins") (together

"Defendants"). The Complaint seeks injunctive and other legal and equitable relief for violations

of certain antifraud, embezzlement and registration provisions of the Commodity Exchange Act

(the "Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-

246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat.

1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 1 et seq.

The Complaint and Summons were served on Defendants on November 26, 2012 by hand

delivery to Jenkins. The court later ordered that Defendants' Answers were due on or before February 22, 2013

but none has ever been filed. On December 21, 2012, the Commission filed an Application for

Entry of a Certificate of Default Pursuant to Federal Rule of Civil Procedure 55(a), which the

Clerk of the Court entered on March 1, 2013.

The Commission now has filed its Motion for Default Judgment, Permanent Injunction, Civil Penalties and Other Equitable Relief Pursuant to Federal Rule of Civil Procedure 55(b)(2), the Declaration of Christopher Giglio and Memorandum in Support (collectively, "Default Motion"). The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, and the Default Motion, and being fully advised, hereby:

ALLOWS the Commission's Default Motion and enters the following findings of fact and conclusions of law, finding Defendants liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalties and Other Equitable Relief Pursuant to Federal Rule of Civil Procedure 55(b)(2) ("Order"), which determines that Defendants have violated Sections 4b(a)(1)(A)-(C), 7 U.S.C. § 6b(a)(1)(A)-(C) (fraud), 4d(a)(1), 7 U.S.C.§ 6d(a)(1) (registration), and 9(a)(1), 7 U.S.C. § 13(a)(1) (embezzlement) of the Act; that Defendant Jenkins is also liable for HLAM's violations of the Act as a controlling person of HLAM pursuant to Section 13(b), 7. U.S.C. § 13c(b) of the Act; and that Defendant HLAM is liable for Jenkins's violations, because Jenkins committed his violations within the scope of his employment or office at HLAM, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2.

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay. The Court therefore directs the entry of Findings of Fact, Conclusions of Law, permanent injunction, and equitable relief, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

2

**I.**

# FINDINGS OF FACT

## A.    The Parties

1.    Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended, 7 U.S.C. §§ 1 et seq., and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (2011).

2.    Defendant Harbor Light Asset Management is a North Carolina limited liability corporation with its principal place of business in Raleigh, North Carolina.  HLAM is not registered with the Commission.  In April 2011, Jenkins submitted HLAM's application for registration as an Introducing Broker, Retail Foreign Exchange Dealer, and Commodity Trading Advisor; the application was subsequently withdrawn without obtaining registered status.

3.    Defendant Michael Anthony Jenkins is an individual residing in Raleigh, North Carolina.  From at least January 2011 through January 2012 (the "Relevant Period"), Jenkins was the member organizer, managing member, owner and President of HLAM and the authorized signatory for the HLAM bank account.  In April 2011, Jenkins applied for registration with the CFTC as an Associated Person of HLAM, but the application was withdrawn without obtaining registration.  Jenkins had previously been registered with the Commission as an Associated Person in 1984.  Jenkins' registration was withdrawn in 1986.

4.    On April 14, 1989, the National Securities Dealers Association ("NASD") permanently barred Jenkins from association with any of its members and fined him $5,000.  The NASD found that Jenkins, without the knowledge and consent of a customer, deposited a customer's check into Jenkins' account for Jenkins' own use and benefit.

3

**B. Facts Establishing Defendants' Violations of the Commodity Exchange Act**

5. Jenkins, directly and on behalf of HLAM, solicited potential HLAM Investors located primarily in Raleigh, North Carolina for the purpose of investing in E-mini S&P 500 Futures ("E-mini Futures").

6. Jenkins met with and solicited potential HLAM Investors in person, in small groups, and by phone.

7. As a result of Jenkins' solicitation efforts, at least 377 HLAM Investors signed a one page Investment Agreement (the "HLAM Investment Agreement"), and completed an HLAM Investor Fact Sheet (the "HLAM Investor Fact Sheet").

8. Most of the funds received from the HLAM Investors ("HLAM Investors' Funds") were not invested in E-mini Futures. Instead, most of the investor funds were misappropriated by the Defendants, as discussed below.

**Material Misrepresentations and Omissions Regarding Use of Funds**

9. The HLAM Investment Agreement, which was signed by Jenkins in addition to the respective HLAM Investor, falsely and intentionally or recklessly, represented to HLAM Investors, *inter alia*, that:

> a. the investment was for "the sole purpose of investing in the Standard & Poor's 500 Emini Contracts;" and

> b. the HLAM Investor's funds would be immediately wired to a specific trading account ("HLAM Investors Account").

10. Jenkins intentionally or recklessly did not disclose to HLAM Investors that HLAM did not have a trading account in its name or that the HLAM Investors Account identified in the HLAM Investment Agreement was held in Jenkins' name.

4

11. Defendants executed at least 377 HLAM Investment Agreements with HLAM Investors during the Relevant Period.

12. Jenkins intentionally or recklessly did not disclose to HLAM Investors that some of the HLAM Investor funds were transferred to a number of trading accounts held not in the name of HLAM, but in personal trading accounts held in the name of and owned or controlled by Jenkins, and used to trade gold futures, oil futures, stock index futures, in addition to E-mini Futures.

13. Jenkins intentionally or recklessly did not disclose to HLAM Investors that some of the HLAM Investor funds were transferred to Jenkins' personal bank accounts where HLAM Investors' Funds were comingled with his personal funds and misappropriated to pay his personal expenses, and to make cash withdrawals and payments to HLAM Investors that purported to be profits.

14. Statements made by HLAM and Jenkins in the HLAM Investment Agreement set forth above, were material misstatements and fraudulent omissions.

## Misappropriation of the HLAM Investors' Funds

15. Of the approximately $1.793 million invested by the HLAM Investors, only $138,825 was transferred to the HLAM Investors' Account to trade E-mini Futures.

16. The trading in the HLAM Investors' Account resulted in losses of $3,536.16, which Jenkins concealed from HLAM Investors.

17. HLAM and Jenkins used some of the HLAM Investors' funds to pay for HLAM Investors' purported withdrawals of principal or fictitious profits, the latter of which HLAM and Jenkins had falsely reported in trading spreadsheets and statements, which they emailed or caused to be emailed to HLAM Investors approximately once a month.

5

18.     Of the amount of approximately $1.793 million that was received by Defendants from HLAM Investors:

    a.      Jenkins misappropriated approximately $886,697.14 by trading in his personal accounts to trade gold futures, oil futures, stock index futures and E-mini Futures and through cash withdrawals and payment of his personal expenses -- including payments for charges at department and discount stores, gasoline stations, cellular phone bills, and airline tickets.

    b.      Defendants made payments of approximately $903,513 to HLAM investors. Of that amount, approximately $411,173.30 of HLAM Investor funds were paid to some HLAM Investors in excess of the principal they invested. These payments purported to be trading profits, but instead were funds that had been deposited by other HLAM Investors.

    c.      In total, Defendants realized a gain of $1,301,406.60 comprised of taking $886,697.14 for trading in Jenkins' personal accounts and through cash withdrawals, payment of Jenkins' personal expenses and paying $411,173.30 to certain investors in excess of their principal invested[1] and a trading loss of HLAM Investors funds of $3,536.16.

## False Statements Regarding Profits and Value of Investments

19.     On a nearly monthly basis throughout the Relevant Period, Jenkins sent or caused to be sent e-mails to some of the HLAM Investors attaching a "comprehensive trading spreadsheet" ("HLAM Trading Spreadsheet") that purported to reflect the deposits made, the net

---

[1]     Payments to certain HLAM Investors in excess of their investment were made at the expense of other HLAM Investors. As there were no trading gains realized by Defendants, which is the only legitimate basis for making such payments, then the funds used by Defendants to make such payments were misappropriated and thus ill-gotten gains to them.

6

dollars/trade balance forward, and the total balance for the respective HLAM Investor's investment.

20.    For example, an HLAM Investor invested $2,000 in November 2011 and on December 22, 2011, Jenkins provided that HLAM Investor with a "spreadsheet update" falsely representing the total value of his investment as $2,584.75 as of December 2011.

21.    In many of the HLAM Trading Spreadsheets, Jenkins and HLAM falsely reported that each HLAM Investor made money every month during the Relevant Period.

22.    In many of the HLAM Trading Spreadsheets Jenkins intentionally or recklessly failed to list or reflect any diminutions in value of Investors' funds during the Relevant Period for trading losses and misappropriation of HLAM Investors' funds. The balance forward and total balance amounts in Trading Spreadsheets provided to HLAM Investors by Jenkins and HLAM were fictitious.

23.    On a near monthly basis, Jenkins also sent or caused to be sent an email to some of the HLAM Investors attaching a "comprehensive trading statement" ("HLAM Trading Statement"). The HLAM Trading Statement listed the "Monthly Net Profit" of the respective HLAM Investor, among other things. Similar to the HLAM Trading Spreadsheets, the available HLAM Trading Statements falsely represented that each HLAM Investor's investment resulted in net profits each month.

24.    For example, an HLAM Investor who invested a total of approximately $200,000 from February through June 2011, received an August 2011 HLAM Trading Statement falsely representing a monthly net profit of $108,021.

25.    Many of the HLAM Trading Spreadsheets and HLAM Trading Statements misrepresented the value of the HLAM Investors' investments and profits generated. Defendants

7

knew at the time these communications were made that some of the HLAM Investors funds had been lost and/or misappropriated.

26. Jenkins and HLAM used their misrepresentations in the HLAM Trading Spreadsheet and HLAM Trading Statements to solicit or obtain additional investments from existing and new HLAM Investors.

## Collapse of HLAM

27. On December 14, 2011, at least some of the HLAM Investors received an email from HLAM stating that effective December 16, 2011, HLAM would no longer actively trade HLAM Investors' accounts, and that HLAM would be "closing and cashing-out the existing accounts."

28. On December 31, 2011, at least some of the HLAM Investors received an email from HLAM further stating that despite "many clients' complaints about the slowness of the cash distribution" and "doubt[s] that the funds exist to cover all of the payouts, rest assured; these funds do exist." The email further stated that "[t]o calm fears and provide reassurances that the accounts are fully funded, I am including my main bank statement (with account information redacted), to provide proof that the funds are real, and you WILL get your money."

29. The fabricated bank statement included with the December 31, 2011 memorandum listed an alleged balance of approximately $8.3 million in the HLAM business account and implied, therefore, that funds existed to cover the payouts to HLAM Investors, when in fact the HLAM business account had only $2,839.33 as of that date.

30. On January 31, 2012, Jenkins wrote to the Attorney General of the North Carolina Department of Justice and stated that he had created HLAM "to invest money for a few individuals;" that he "had no previous knowledge of running a business, much less an investment

8

business;" that he had "done a poor job of running this entity;" and that he needed legal guidance how to solve these "issues." Also, on January 31, 2012, Jenkins called the North Carolina Department of the Secretary of State and stated that he "had made his clients some money, but lately he had not;" that he knew that he "should have been registered," and that he wanted to "come clean."

31. On the afternoon of February 1, 2012, an email from HLAM was transmitted to HLAM Investors stating, inter alia, that "[i]t appears that Mr. Jenkins at minimum is running a fraudulent activity, that could even be a Ponzi Scheme." It further stated that, "we regret to inform you that HLAM and Mr. Jenkins has [sic] failed to show proof of funds or control of funds that would be used for disbursement to his clients. After repeated attempts to ascertain the validity of Mr. Jenkins claims of trading success we regret to inform all HLAM clients that no proof has been forthcoming that would indicate that Mr. Jenkins traded . . . ."

## Jenkins Failure to Register as an FCM

32. During the Relevant Period, without registering as a Futures commission Merchant ("FCM"), Jenkins acted as an FCM by accepting orders for the purchase and sale of futures and in or in connection with such acceptances of orders, accepted money, securities, or property (or extended credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that resulted therefrom.

33. As a consequence of this conduct, Jenkins was required to be registered as an FCM and his failure to do so was a violation of the Act.

## Jenkins Embezzled and Stole HLAM Investors' Funds

34. Jenkins was required to be registered under the Act as an FCM.

9

35. During the course of his activities when he was required to be registered as an FCM, Jenkins embezzled, stole, purloined and converted HLAM Investors' Funds, which were received by him to trade in accordance with the HLAM Investor Agreements.

## **Jenkins Controlled HLAM**

36. During the Relevant Period, Jenkins controlled HLAM.

37. The articles of incorporation of HLAM identify Jenkins as its member organizer and President.

38. During the Relevant Period, HLAM's business address and Jenkins' residence in North Carolina were the same.

39. Jenkins solicited and accepted investments from HLAM Investors.

40. The HLAM Investor Agreements were executed by Jenkins on behalf of HLAM.

41. Jenkins was the only authorized signatory in the HLAM business bank account.

42. Throughout the relevant period, on a nearly monthly basis, using an HLAM email account, Jenkins sent or caused to be sent HLAM Trading Spreadsheets and HLAM Trading Statements to many of the HLAM Investors.

43. HLAM Investor requests for withdrawals from HLAM were addressed to Jenkins. Jenkins made the withdrawals and paid HLAM Investors on behalf of HLAM.

## **II.**

## **CONCLUSIONS OF LAW**

### **Jurisdiction and Venue**

1. This Court has jurisdiction over this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a

10

violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

2. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

## Violations of the Commodity Exchange Act

### Fraud in Connection with the Trading of On-Exchange Futures Contracts by HLAM and Jenkins

3. By the conduct described in paragraphs 5 through 43 of the Findings of Fact above, Defendant directly and on behalf of HLAM, cheated or defrauded or attempted to cheat or defraud other persons, willfully made or caused to be made to the other person any false report or statement, and willfully deceived or attempted to deceive other persons in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person by fraudulently soliciting prospective and existing investors by, among other things, knowingly (a) misappropriating HLAM Investors' funds; and (b) making material misrepresentations and omissions, including but not limited to: (i) misrepresenting that all funds invested by the HLAM Investors would be invested E-mini Futures through an account maintained at an FCM; (ii) misrepresenting that trades executed in connection with the HLAM Investments were profitable and that the HLAM Investors were earning profits from the trading of their funds by means of the HLAM Trading Spreadsheets and HLAM Trading Statements, and instead providing HLAM Investors with false statements; (iii)

11

knowingly omitting that some of the HLAM's Investors' Funds would not be deposited in any trading account; (iv) knowingly omitting that some of the HLAM Investors' Funds would be deposited in a number of trading accounts held not in the name of HLAM, but in personal trading accounts owned or controlled by Jenkins and used to trade gold, oil, and stock index futures, in addition to E-mini Futures, and (v) knowingly omitting that HLAM Investors' Funds would be transferred to Jenkins' personal bank accounts, commingling such funds with his personal funds and using them for personal use in violation of Section 4b(a)(1)(A)-(C) of the Act, as amended, 7 U.S.C. § 6b(a)(1)(A)-(C).

4. By the conduct described in paragraphs 3 through 43 of the Findings of Fact above, Jenkins committed the acts and omissions described herein within the course and scope of his employment or office with HLAM; therefore, HLAM is liable as principal pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2011), for violations of the Act committed by its agent, Jenkins.

5. By the conduct described above in paragraphs 3 through 43 of the Findings of Fact above, Jenkins is a controlling person of HLAM, and failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations. Therefore, Jenkins is liable for the unlawful conduct of HLAM and its violations of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

## Jenkins Engaged as an FCM While Unregistered

6. By the conduct described above in paragraphs 5 through 43 of the Findings of Fact, Jenkins acted as an FCM by accepting orders for the purchase and, in or in connection with such acceptances of orders, accepted money, securities, or property (or extended credit in lieu

12

thereof) to margin, guarantee, or secure any trades that resulted therefrom in violation of Section 4d(a)(1), 7 U.S.C. § 6d(a)(1).

7. By the conduct described above in paragraphs 3 through 43 of the Findings of Fact above, Jenkins committed the acts described herein within the course and scope of his employment or office with HLAM; therefore, HLAM is liable as principal pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2011), for violations of Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), committed by its agent, Jenkins.

**Jenkins Embezzled and Stole HLAM Investors' Funds**

8. By the conduct described above in paragraphs 5 through 43 of the Findings of Fact, Jenkins knowingly and fraudulently solicited and accepted HLAM Investors' Funds and appropriated them for his own use, thereby embezzling, stealing, purloining and converting said funds, which were received by him to trade in accordance with the HLAM Investor Agreement without registering as an FCM, while he was required to be registered as an FCM under the Act, in violation of Section 9(a)(1) of the Act, 7 U.S.C. § 13(a)(1).

9. By the conduct described above in paragraphs 3 through 43 of the Findings of Fact above, Jenkins committed the acts described herein within the course and scope of his employment or office with HLAM; therefore, HLAM is liable as principal pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2011), for violations of Section 9(a)(1) of the Act, the Act, 7 U.S.C. § 13(a)(1), committed by its agent, Jenkins.

**There is a Reasonable Likelihood of Continued Misconduct by Defendants**

10. Defendants' repeated violations of the Act indicate a likelihood of continued violations absent a permanent injunction. Jenkins began soliciting customers to trade in E-mini

13

Futures at least as early as January 2011, continuing through January 2012. These fraudulent solicitations were not isolated occurrences, but instead constitute an established pattern. Jenkins acted with knowledge that his representations were fraudulent and actively took steps to disguise his fraud, notably through sending fraudulent HLAM Trading Spreadsheets and HLAM Trading Statements to HLAM Investors and representing to such investors, even after the collapse of HLAM, that there were sufficient funds to cover HLAM's investments and profits. Jenkins did so after he had worked as a Commission registrant and his conversion of a client's funds had resulted in his being barred from the securities industry in 1989. Jenkins's long history of fraud and conversion, in addition to Jenkins' and HLAM's pattern of fraudulent misrepresentations and efforts to disguise their fraud, present a "reasonable likelihood" of future violations warranting permanent injunction against both Jenkins and HLAM.

## III.

## ORDER OF PERMANENT INJUNCTION AND ANCILLARY RELIEF
## IT IS HEREBY ORDERED THAT:

1. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, the Defendants Jenkins and HLAM are permanently restrained, enjoined, and prohibited from directly or indirectly:

> a. cheating or defrauding or attempting to cheat or defraud any other person in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of, or with, any other person, in violation of Section 4b(a)(1)(A) of the Act, 7 U.S.C. § 6b(a)(2)(A);

14

b. willfully making or causing to be made to any other person any false report or statement or willfully to enter or cause to be entered for any other person any false record, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of, or with, any other person, in violation of Section 4b(a)(1)(B) of the Act, 7 U.S.C. § 6b(a)(1)(B);

c. willfully deceiving or attempting to deceive any other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of, or with, any other person, in violation of Section 4b(a)(1)(C) of the Act, 7 U.S.C. § 6b(a)(1) (C);

d. embezzling, stealing, purloining, or with criminal intent converting to such person's use or the use of another, any money, securities or property having a value in excess of $100, which was received by such person or an employee or agent thereof to margin, guarantee, or secure the trades or contracts of any customer or accruing to such customer as a result of such trades or contracts or which otherwise was received from any customer, client, or pool participant in connection with the business of such person registered or required to be registered under the Act, or any employee or agent thereof, in violation of Section 9(a)(1) of the Act, 7 U.S.C. § 13(a)(1); and/or

15

e.     engaging as a futures commission merchant, as defined in Section 1a(28) of the Act, 7 U.S.C. § 1a(28), in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market or derivatives execution facility, and in connection with such soliciting orders or accepting orders or such contracts, accepting any money, securities, or property (or extending credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom, without registering, under the Act, with the Commission as such futures commission merchant and such registration shall not have expired nor been suspended nor revoked.

2.     The Defendants are also permanently restrained, enjoined, and prohibited from directly or indirectly:

a.     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a);

b.     entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3 (hh) (2011) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, and as further defined by Commission regulation 1.3(xxx), 17 C.F.R. 1.3(xxx)) and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for any

16

personal account or for any account in which either of them has a direct or indirect interest;

c.      having any commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or forex contracts traded on behalf of either of them;

d.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or forex contracts;

e.      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or forex contracts;

f.      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and/or

g.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011) ), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

17

## IV.

## RESTITUTION, CIVIL MONETARY PENALTY AND OTHER EQUITABLE RELIEF

## IT IS FURTHER ORDERED THAT:

### A. Restitution and Appointment of Monitor

3.     Pursuant to Section 6c(d)(3) of the Act, 7 U.S.C. § 13a-1(d)(3), Defendants shall pay and be jointly and severally liable for restitution to defrauded investors in the amount of one million three hundred and one thousand four hundred and six dollars and sixty cents ($1,301.406.60), which is the total amount of funds solicited and received by Defendants less the amount properly returned to HLAM Investors (the "Restitution Obligation").[2] In addition, Defendants are required to pay pre-judgment and post-judgment interest on the Restitution Obligation. Pre-judgment interest on the Restitution Obligation should be paid at the then prevailing underpayment rate established by the Internal Revenue Service, pursuant to 26 U.S.C. § 6621. Post-judgment interest shall accrue beginning on the date of entry of this Order and will be calculated by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961. All Restitution Obligation payments and any corresponding interest awards will be immediately due and owing.

4.     To effect payment by Defendants and distribution of the Restitution Obligation, the Court appoints the NFA as Monitor ("Monitor"). The Monitor shall collect the Restitution Obligation from Defendants, and make distributions as set forth below. Because the Monitor is acting as an officer of the Court in performing these services, the Monitor shall not be liable for any action or inaction arising from the Monitor's appointment, other than actions involving fraud.

---

[2]     See note 1 above.

18

5.     Defendants shall make Restitution Obligation payments under this order in the name "HLAM- Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier check, or bank money order, to Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of the proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to (a) the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581. Notice of payment shall also be sent to the Regional Counsel, Commodity Futures Trading Commission, Eastern Regional Office, 140 Broadway, 19th Floor, New York, NY 10005.

6.     The Monitor shall oversee Defendants' Restitution Obligation, and shall have discretion to determine the manner for distribution of funds in an equitable fashion to defrauded investors, and others identified in the list that shall be provided to the Monitor upon entry of this Order ("Restitution List"), as appropriate, or may defer distribution until such time as it deems appropriate. In the event that the amount of restitution payments to the Monitor are of a de minimis nature such that the Monitor determines that the administrative costs of making a restitution distribution is impractical, the Monitor may, in its discretion, treat such Restitution Obligation payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth below.

7.     Defendants shall cooperate with the Monitor as appropriate to provide such information as the NFA deems necessary and appropriate to identify defrauded investors to whom the Monitor, in his sole discretion, may determine to include in any plan for distribution of

19

any Restitution Obligation payments. Omission from the Restitution List should not limit the ability of any defrauded investor to seek recovery from Defendants or any other entity or person.

8. Upon the termination of the receivership estate, the Receiver shall provide the Commission with a report detailing the disbursement of funds to the defrauded investors. The Receiver shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

9. The amounts payable to each defrauded investor shall not limit the ability of any defrauded investor from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any defrauded investor that exist under state or common law.

10. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each defrauded investor of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Consent Order and to hold Defendants in contempt for any violations of any provision of this Consent Order.

11. To the extent that any funds accrue to the U.S. Treasury as a result of Defendants' restitution obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above in paragraph IV. A. 7.

## B. Civil Monetary Penalty

12. Defendants shall pay and be jointly and severally liable for a civil monetary penalty in the amount of three million nine hundred four thousand two hundred nineteen dollars and eighty cents ($3,904,219.80), plus post-judgment interest, which is triple the amount of the

20

gain to Defendants (the "CMP Obligation"). Post-judgment interest shall accrue on the CMP

Obligation beginning on the date of entry of this Order and will be calculated using the Treasury

Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

13.     Defendants shall pay their CMP Obligation by electronic funds transfer, or by

U.S. Postal money order, certified check, bank cashier's check, or bank money order. If payment

is to be made other than by electronic funds transfer, the payment shall be made payable to the

Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables -AMZ-340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOTIFAAIMMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK, 73169
> Telephone: 405-954-5644

If payment is to be made by electronic funds transfer, Defendant shall contact Linda

Zurhost or her successor at the above address at the above address to receive payment

instructions and shall fully comply with those instructions. Defendant shall accompany payment

of the penalty with a cover letter that identifies the paying Defendant and the name and docket

number of the proceedings. The Defendant shall simultaneously transmit copies of the cover

letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading

Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, Notice of

payment shall also be sent to the Regional Counsel, Commodity Futures Trading Commission,

Eastern Regional Office, 140 Broadway, 19th Floor, New York, NY 10005.

## C.    Miscellaneous Provisions

**Order of Payments:** Defendants' obligation to pay restitution and civil monetary

penalties are all due and owing as of the date of this Order. Should Defendants, however, not be

21

able to satisfy all these obligations at the same time, any payments from Defendants shall first be used to satisfy their restitution obligation. After Defendants' restitution obligation is satisfied fully, then any of Defendants' payments shall be applied to satisfaction of the civil monetary penalties.

**Change of Address/Phone:** Until such time as Defendants satisfy in full their CMP Obligation and restitution obligation as set forth in this Order, Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number or mailing address within ten (10) calendar days of the change.

**Equitable Relief:** The equitable relief provisions of this Order shall be binding upon Defendants and any person who is acting in the capacity of agent, employee, servant, or attorney of Defendants, and any person acting in active concert or participation with Defendants, who receives actual notice of this Order by personal service or otherwise.

**Notices:** All notices required to be given to the CFTC or the NFA by any provision in this Order shall be sent certified mail, return receipt requested, as follows: Notice to CFTC: Attention - Regional Counsel, Commodity Futures Trading Commission, Division of Enforcement, 140 Broadway, 19th Floor, New York, NY 10005; Notice to NFA – Daniel Driscoll, National Futures Association, 300 S. Riverside Plaza, Suite 1800, Chicago, IL 60606-3447.

**Continuing Jurisdiction of this Court:** This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

22

Additionally, the CFTC shall submit a proposed judgment consistent with this order in word-processing format to Jolie_Skinner@nced.uscourts.gov, no later than January 31, 2014.

Although the court will continue to exercise jurisdiction over this case, the Clerk of Court is DIRECTED to close it administratively.

SO ORDERED.

This the $2\overset{\smallsmile}{2}$ day of January, 2014.

James C. Fox
James C. Fox
Senior United States District Judge